Our third and final case this morning, 25-2177 Driggs v. the Central Intelligence Agency. Mr. Clark. Good morning. John Clark on behalf of the plaintiffs in this Freedom of Information Act lawsuit. There are a number of issues that the plaintiffs have raised. I'll start with what I believe is the most important one, and that is that issue regarding bad faith. Now the issue there is whether or not bad faith in the underlying activities which generated the records at issue may be used to overcome the presumption of good faith ordinarily accorded to agency affidavits. Now the plaintiffs cite two cases in support of their position, Jones v. FBI and Ruggerio v. FBI. In Jones, the issue was COINTELPRO, which the Jones court described as a sophisticated vigilante operation aimed squarely at preventing the exercise of First Amendment rights. Now under the district court's view in this case, that would have been entirely irrelevant as a matter of law. In the reporter's committee . . . to assume that Jones was right. That case seems different because everybody had conceded sort of the underlying bad faith when it comes to COINTELPRO. That was sort of openly and notoriously in bad faith. But where is the evidence of bad faith here? The evidence . . . we have a significant evidence of bad faith here. That's the second issue that we raised is whether or not the plaintiffs had sufficiently demonstrated bad faith in the underlying activities that generated the records at issue. I suggest . . . well, first of all, the district court said it's irrelevant . . . I know, but I'm just trying to figure out whether the legal issue matters in this case because it just looks to me like what you have is evidence of a disagreement, to be sure, between Senator Smith and then the CIA and Department of Defense, and maybe even soon for now, as alleged, evidence that the NIE . . . and I can't remember what that stands for . . . that the NIE was wrong. But that's different from bad faith. I mean, there can be a mistake that is not bad faith. So where is the evidence of actual bad faith here? Well, the evidence of actual bad faith, I would suggest, is in Senator Smith's 160-page review of the NIE, which is the National Intelligence Estimate, and that . . . the National Intelligence Estimate was 33 pages. Now, Senator Smith quoted . . . took excerpts from 40 excerpts of that 33-page National Intelligence Estimate and, I think, just destroyed the credibility of that National Intelligence Estimate. And not only did Senator Smith make a very compelling, I think, argument that the National Intelligence Estimate did not properly, you know, interpret the evidence, but the National Intelligence Estimate even left out evidence that Senator Smith gave to the author, and they just didn't mention it. I think, in the plaintiff's opinion, it was clearly bad . . . it clearly made him bad faith. I mean, you know, this has been going on for, you know, something like 40 years, and there have been significant efforts to get the government to reveal what it knows about the 600 men that were left behind at the close of the Vietnam War. So I . . . And Jones and Ruggiero, it seems as if there's this very high standard to do what, I guess, you're trying to do here, to apply the collateral bad faith. So I guess what I'm asking is, what here meets that standard? The question of what is the burden of proof is, you know, I don't know what the answer is to that. The two cases that we cite don't really say . . . one of them says that it's a high burden of proof. Now, I don't know. It would seem to me that a preponderance of the evidence would be the burden of proof, but maybe it's clear and convincing. There's really no direction on that, but I would suggest to the Court that even if it is clear and convincing, Senator Smith's 160-page review met that burden, I think, clearly. And also, the district court said that it was irrelevant as a matter of law, and that they did so . . . but then he went on . . . The district court did go . . . oh, I was just about to say, sorry, the district court did go on to say, in any way, I don't think you could meet that standard. Right. That's exactly what the district court said. And I guess we're sort of focused on that piece of it for the moment.  Well, the government argues that that finding by the district court should be reviewed on a clear error standard, and that is not accurate, in my view. It should be de novo, because the court said it's not relevant as a matter of law, and that would be a review de novo. That we would review de novo, but I really am struggling with kind of . . . if we were to assume for a minute that the Sixth Circuit standard applies, collateral bad faith suffices, I'm just trying to figure out how we tell the difference between a heartfelt disagreement between Senator Smith and these agencies, even a lengthy disagreement with lots of pages, that's just a disagreement. You interpreted the data wrong. You didn't look at all of the right stuff. That is . . . I think if we were to say that by itself amounts to bad faith, we would be opening up an extremely large exception. There are always heartfelt disagreements about what the government is doing. Well, I wouldn't characterize this as a heartfelt disagreement. I would characterize it as a cover-up. And I think that . . . I know, but I'm just wondering, I don't think we can . . . I also don't think we can decide based on how a dispute is characterized by one of the litigants. We would be looking for actual evidence of bad faith. Yes, Your Honor, I think the actual evidence of bad faith is evident by the plethora of information that the NIE omitted that Senator Smith actually gave to them. So that's my view on that. The district court also said that the Fourth Circuit has not adopted the view that the Sixth Circuit has. That is correct. However, they have not rejected it either. In fact, no court in any jurisdiction whatsoever has rejected this . . . of this collateral bad faith. Young, because that's the case that the district court cites is Young, characterizes it as a kind of . . . My recollection of that case was that it had to do with in-camera inspection, but I don't . . . the court did not, in Jones, to my recollection, reject that, nor . . . and I think if they had, the government would have cited it for that purpose, but that's my understanding. And in this de novo review of the evidence of bad faith, I would respectfully suggest that the court review the record to see whether or not that the plaintiffs have proved bad faith. So next, the plaintiffs also argue that the CAA did not meet its burden to show the applicability of the exemptions that it asserts. Now, the context of this information that is redacted, we know what it is that is redacted generally, and that is what the Russians reported regarding unrepatriated Vietnam War POWs. Now, the government argues the fact that this was . . . that this occurred . . . that this addresses items that occurred over 50 years ago is irrelevant. I would suggest to the court that that is not true. The CIA fails to provide any explanation of how the information provided by the Russians could possibly undermine national security, none whatsoever. Well, but the rub there is that when you're dealing with information like this, there's always a difficulty and a challenge in being too specific, because if you're too specific, that eliminates the very purpose for which the exemption is being requested, right? You've got this affidavit from the custodian of records. She asserts, I will admit, fairly conclusorily that the disclosure of this information would damage national security, disclose intelligence sources, methods of intelligence, that kind of stuff, and it stops there without going into further detail. But the reason why it stops there is because if you give more detail, you've essentially disclosed the very information that you want to keep secret. That is a point well taken. But I have asked the government for just an explanation of how it possibly could fall into one of these exemptions, and I haven't gotten an answer. They responded that the plaintiffs are not entitled to such granularity of detail. But if you think about what it is we're talking about here, we're talking about what the Russians said about unrepatriated U.S. POWs from the Vietnam War. How is that going to interfere with, and again, over 50 years ago, how is that going to interfere with national security? I don't see how it could. I've asked for an explanation, and I haven't received one. The plaintiffs suggest that the reason that the government is withholding this information is because it would further embarrass them. And Executive Order 13-526 says, and I'm quoting, prohibits classification to prevent embarrassment to a person, organization, or agency. And I believe that that is exactly what is happening here. Now, another issue that the plaintiffs raise is that they suggest that the district court erred in denying plaintiffs' motion for in-camera inspection. And the court in Allen v. CIA, District of Columbia case, set forth six factors that the court should look at to see whether or not it would be appropriate for in-camera inspection. One is the conclusory nature of the agency's affidavits. We've covered that. The court commented on that. That's the way we look at it. Another factor is judicial economy. We're only asking that the court review the redacted portions of just 29 pages. I suggest that that would not be difficult for the court to do. Another factor is disputes concerning the contents. We believe that we have good cause to question the CIA's explanation for its withholdings. And then there was bad faith. We've talked about that. And then lastly, the strong public interest in disclosure. Now, this information is part of a much larger advocacy that spans almost 50 years by family members, journalists, authors, organizations, congressional committees, at least three administrations, and an act of Congress, all seeking to prompt the government to reveal what it knows about this. Counsel, I'm sorry. I am confused at the, I guess, how we think about those factors for when there needs to be in-camera review if we agree with the district court that the affidavit was, in fact, sufficient. If the affidavit is sufficient, do you still have to run through all of those factors to decide that you don't want to also do in-camera review? I thought we had at least, I thought we had said in Young that, look, if the affidavit is sufficient, obviously, in-camera review is unnecessary. And you only apply those factors if you think the affidavit might not be sufficient. I believe that the court suggests that, or at least the court in Allen suggests you look at all of the factors, take all of that into consideration, and then— Even if the affidavit is sufficient. Well, you know, as we've discussed, the affidavit is not going to— Right. That was my question, whether these are two independent arguments you're making or whether you are arguing, whether the premise for your argument about in-camera hearing being necessary is that, first, we agree that the affidavit is insufficient. I don't think that we have to agree that the affidavit is insufficient in order to go to the six factors. So I think that the issue— I guess just as a matter of common sense, if a district court finds the affidavit is sufficient, I am persuaded that the exemptions apply, you think you might still have to go ahead and do an in-camera review? Yes, because, yeah, that would be my position, particularly since we are talking about the disputes concerning the contents, and again, the plaintiffs' question, the CIA's explanation. And also, the plaintiffs argue that the—about a provision of the CIA Act, which is an exception to the ordinary circumstance where the CIA does not have to search its operational records, period. You don't even have to search them. And it's a very short portion of the CIA Act, 3141F3, and I'll read a part of it. When a complaint alleges that the requested records were improperly held because of improper placement in solely exempted operational files, the complainant shall file—shall support such allegation with sworn submission based upon personal knowledge or otherwise admissible evidence. Now, we did that. We submitted an affidavit from Senator Smith based on personal knowledge, and we also submitted an affidavit by Kevin Chipp, who's a former CIA employee who held classification authority, and they both said that it was improper withholding. Now, we also cite at least one case—we know of at least one case, Hall v. CIA in the District of Columbia, which held that these affidavits were sufficient to trigger the CIA to have to search their operational records. And we cite in that case, the affiant, one of them was Senator Bob Smith, just as in this case. So, also— Can I ask you a question about Hall? I thought Hall had to do with a different subsection of the statute, F-4, not F-3. When F-4 talks about allegations that requested records were improperly withheld because of an improper exemption as opposed to an improper placement, is there a difference? Well, that's a good question. I think that there is not a difference, and I would say— Subsections, one for an improper exemption, meaning— Yeah, and frankly, I'm trying to figure out what the difference is, but F-4, F-3, two different exemptions. Hall talks about F-4. You're talking about—you relied on F-3, but go ahead. Yeah, I was just going to alert the Court that most of the Freedom of Information Act requests that we made in the district court were for records of POWs that were not unrepatriated at the close of the Korean War, and that's 75 years ago, and we would suggest that improper placement should be read to include improper retention after 75 years. I see my time has expired. You've got some time left for rebuttal. Thank you, Mr. Cook. Thank you. Mr. Metzger. Good morning, Your Honors, and may it please the Court, Assistant United States Attorney Matthew Metzger on behalf of the Central Intelligence Agency, CIA for short. At issue, this case boils down to two key issues. First, whether the district court properly upheld the CIA's exemptions under FOIA Exemption 1 and FOIA Exemption 3, and second, whether the district court properly concluded that the CIA was under no obligation to search its operational files. As there was no error, this Court should affirm. I'd like to start first on the withholdings issue. As this Court is aware, withholdings were made under Exemptions 1 and 3, and this Court can affirm on either basis, and I'd like to start this portion on Exemption 3. There are two burdens that the government must meet, first in identifying a withholding statute, and then identifying whether the information in the underlying records falls within that statute's coverage. My friend has not disputed that we've properly identified two withholding statutes here, the National Security Act and the CIA Act. Indeed, both the Supreme Court, as well as the D.C. Circuit Court in DeBacco, have acknowledged that both such statutes meet the parameters of B3. And then, as reflected in the Williams Declaration submitted in the Joint Appendix, we described how the underlying 23 pages of information fall within the statute's coverage. Your colleague on the other side says that that description just isn't sufficient enough to provide a sound basis for deciding whether or not the information should be exempted or not. So, Your Honor, I would first direct this Court's attention to Bowers, which reminded that the touchstone of the analysis on the government's justification, particularly in the national security space, is to provide generic disclosures. And that was the word this Court used, generic. Quoting this Court's prior decision in Spanaus, Spanaus, I'm sure I'm not pronouncing that correctly, which in turn separated Supreme Court precedent. So, to say that we are required to provide granularity would run counter to this Court's prior holding. And second, we did provide a lot of particularized information here. The declarant refers to the report itself, so it's not just engaging in the abstract with national security concepts. It's addressing the 23 pages that are in dispute with the parties and articulating what is underlying there. And I think, given the context of this information, particularly what my friend has admitted here, if we're talking about information that's coming from the Russians, given the context of looking for prisoners of war on foreign soil, it is easily conceivable to think that the United States government is drawing on foreign sources that we need to protect, or at least instill competences. And the reason we do that, I would ask this Court to look at the remarks and the holding of the Supreme Court's decision in Sims, because we need to protect not just the underlying source, but the confidentiality surrounding those sources. Because if we lead any suggestion that there is the risk of leakage or spillage of information, our sources that we rely upon for our core intelligence-gathering activities, the gravamen of the CIA's function, those sources disappear and we're without recourse to have intelligence that we need to conduct the government's business. Mr. Clark mentioned the passage of time. I think he said 50 years, and I don't have any sense of whether or not 50 years is a long time in the intelligence sphere, but maybe you can speak to that. I mean, his point is, it's been 50 years, clearly this information can't be all that relevant to national security. I'd start first, Your Honor, in responding with the texts of the two statutes. There's no consideration for age, just the type of information that needs to be withheld from the public and charging the Director of the Office, the Director of National Intelligence and by delegation to the Director of CIA that this information is too protected. In our papers, we cited several D.C. Circuit cases that say age is not a consideration to be accounted for, and ultimately, I can appreciate the court trying to wrestle with this question of age, but ultimately, understandably, there could be sources that, you know, if they are human sources, that, you know, were young, could still be very much alive today. If these are generalized public sources, which we are allowed to rely upon, the Supreme Court and Sims touched on, we could be relying on them today as well. So the fact that so much time has elapsed doesn't really impact the FOIA analysis that we have before the court. I would make this observation, though, however, Your Honor, time is relevant for the classification analysis. Yeah, I was going to ask you about that, because the District Courts, I think, found that in December of 20—December, I think, 2025, these documents would be declassified. Has there been a request or, I mean, what's the status? Have the plaintiffs requested the—? Your Honor, I don't know if there's been a follow-up request in any respect. If there was, that would just be my friend dialoguing with the agency, and in the administrative process, it hasn't come to any type of completion, potentially, or reached the stage of my friend needing to, you know, initiate a new complaint, because it's a new FOIA request in federal court, as is his right, if he feels that that's the vindication he needs to get the requested records. But we would submit that at the time of the agency's disclosure here, and I think approximately 2024, the District Court's opinion was rendered in 2025, that that is a frozen moment in time, because the FOIA doesn't impose, as a rough analog, the continuing updating obligation that's found in Federal Rule of Civil Procedure 26E. Otherwise, there would be no repose in the agency to give conclusion to any one FOIA request, and it's always why a requester can make follow-up requests, and I think that's particularly poignant in this space, when the terms of the executive order set expirations on classification, it's 25 years subject to exemptions. Now, we have argued, and do argue, that the exemptions are applicable here, but the passage of time is something that the agency revisits when looking at these records, whether it's in response to requests from my friend, or as required by Congress. There is a decennial review in which these questions are put upon the agency every decade, and so each decade, and the review is ongoing now for 2025 to cover itself to 2035, to examine classification matters, to examine just other, the touchstone of the language in Paragraph G of Section 3141, it escapes me, but there's, it's, all those considerations are at play for reaching, if there could be a point where the joint report, once released, once withheld in full, now released in part, could ever then be released in full, and this is gonna unfold potentially through time, but focusing on the snapshot that we have here, the agency looked to the underlying information, and did determine that it was protected by these statutes, and as well as classified under the terms of the identified executive order. Can I ask a question about this FOIA generally, which is intended, I think, to be a sunshine act, right, that cuts across a great many agencies and entities, but it seems to be an odd pairing with the national security apparatus, which main purpose is to keep secrets, right, and so you talk about the first two exemptions that you're relying on, but then I assume you're gonna get to these statutes that would, I just wanted to understand whether or not you think the statutes independently from the other exemptions cover the entire swath of information that the plaintiffs are seeking in this case, whether they independently would exclude all of the information that's being sought. So, to, the honor's question is yes, the two statutes we identified, the National Security Act, the CIA Act, they provide the basis for exemption three, to not disclose the information, and this is where, within FOIA itself, there are two different competing interests. Congress said that generally, yes, to your honor's point, information is to be disclosed, government in the sunlight, but on the other hand, Congress made nine exemptions of information that shall not be publicly disclosed, and I think as this court articulated in power just recently in 2024, those are equally within the public interest not to be disclosed. So, within FOIA itself, there's this inherent paradox, too, and so, yes, independently to affirm us, we would, I would reiterate to the court that both the two statutes we identified, the National Security Act, the CIA Act, are a sufficient basis to uphold the redactions to the 23 pages of the report, and that's because, as noted in our papers, the redactions were made on both bases, so the court does not need to necessarily reach both of them, it just can rest on one or the other. And does the issue of bad faith matter in that context? Your honor, we have, I would say no, because while this was not highlighted admittedly in the brief, I think the only consequence, if this court finds that we had bad faith, obviously we dispute that point, is that that adjusts the assessment of the submitted evidence, and ultimately then the court can still find, based on what's been submitted, that we still have met our burden, it is our burden under the FOIA to show that the redactions are in fact justified, and I think in this particular context, pointing again to Bowers, where this court said it is an imperative, and that's the word this court used, that deference be given to the national security declarants trying to uphold or justify the redactions, that is dial back some in assessing the evidence that we be submitted. But of course, I would point to the court that this court's decision is young, as well as some have made clear that the bad faith, good faith analysis is linked to the processing and handling of the FOIA case, FOIA is not a reach into the rest of underlying policy making to ferret out different actions of the government, and I say that with a particular emphasis to this court's requests, there the court made plain that the attempted requests to get information about the documents, the documents generation, goes too far for the reach of FOIA, because FOIA is ultimately about whether or not documents which are in fact responsive to a FOIA request go out the door pursuant to the FOIA's terms. But just as a matter of common sense, can I ask you about that, just imagine sort of a conduct was in bad faith, I mean, why wouldn't that be relevant if I appreciate that what we're looking at is the credibility of an affidavit that is subsequently filed in connection with the FOIA litigation, but why wouldn't it be relevant to whether you presume that that affidavit is in good faith or whether you worry that given the really, the undisputed bad faith that underlies this whole thing, the affidavit might be part of an effort to sort of cover that up and avoid the embarrassment of that? I mean, they don't seem so entirely distinct to me. Your Honor, I would say that they are distinct, and I think drawing from that is this ever need in FOIA litigation to bifurcate kind of the underlying, you know, facts as they were, as they were revolving in real time versus the underlying processing of the FOIA request, and I think the Clinton decision from the D.C. Circuit kind of sheds light on this, because to suggest that the underlying facts, because I'm running out of words to dialogue here, become relevant, then surely a requester's entitled to discovery about them, because in some limited capacities, as this Court recognized in Simmons, discovery can come about. I mean, just again, it just seems like if you think there was bad faith in the underlying conduct, and then you get an affidavit saying, I mean, there is some information, but for the following reasons, we don't have to disclose it under FOIA, like couldn't that at least bear on whether you want to maybe do an in-camera hearing, just do like a little check of things? And I will tell you that like I feel this is a difficult time for you to be making this argument, because there really are questions these days being raised about the presumption of regularity, the presumption of good faith, that perhaps in an earlier time, courts didn't have as much reason to be concerned about. But right now, I have to say I'm somewhat reluctant to kind of endorse a bright line rule that says we're not going to pay any attention to sort of what else is going on in this picture, we're going to kind of silo out this affidavit and look at the affidavit alone. So I think, remember, in the larger context, it's about, first, there are really two core issues in a FOIA case. What was the nature of the search that was done to find records in response to the request, and then to justify redactions? Redactions are made on well-known bases, and there is, I don't think, that in running through the list, there is a way to just shoehorn information to say, we're here to just package up embarrassment, or to safeguard embarrassment. As reflected in this record, they're pointing to tangible bases as to why the information was. Yeah, and that might go to your earlier dialogue with the Chief Judge about whether, even if you did want to say maybe, even without the presumption of good faith, maybe this affidavit citing these two specific statutes, withholding statutes might nevertheless be sufficient. But let me give you a hypothetical, and I hope it doesn't come across as overly inflammatory. But just as a matter of common sense, if someone sought records from DHS right now related to the ICE killings in Minneapolis, and DHS were to submit an affidavit saying, yes, we have responsive documents, but we're withholding them under certain exemptions, and you should just trust us. These are properly withheld under those exemptions. I have to say, I'd be sort of hard-pressed to kind of divorce the good faith of that affidavit from the rest of the picture. So I respond to this court's hypothetical by thinking of the courts holding in Young, where it always made certain to categorically safeguard the district court's discretion, because if- But this district court thought it didn't even have discretion to look at the whole picture. I don't, the discretion in your hypothetical, Your Honor? Yeah, I think this district court thought, as a matter of law, I can pay no attention to anything else that happened in Minneapolis. I just need to look at this affidavit. And whether, you know, I think he did say, as a matter of law, collateral bad faith going to the underlying conduct is not relevant. And I appreciate the court asking this in terms of, you know, sitting in the district court, but I think I'm reacting to, you know, this appellate posture, which is if you're going to then reprimand or potentially reverse the district court's conduct, you would need to identify a rule to say this is an abuse of discretion. And if it's going to say it's forever linked to some type of predicate fact, if X, then Y, I think Young has foreclosed that, because it was just a, Young made, was reacting to, this is a small request, please review. This court said, this is dangerously close to a per se requirement of in-camera review, and we will not do that. So, I think I'm reacting to this court's hypothetical to articulating a broader rule as opposed to, and maybe there's a way it's announced that it could be a hyper-articulated, one-off nuance, that's one in a million cases, to get away from what this court has already held in Young, but I'm trying, I'm not fully capturing it. Can I follow up on that? So, it may be that, and I'm not suggesting that this will be the answer, but if we're satisfied that on this record, there does not appear to be any evidence of bad faith, and so I want you to address that. There were two points that your colleague on the other side made. He latches on to the Senator Smith affidavit and suggests that there was a dispute between the CIA over the interpretation of that evidence, and the CIA rejected Senator Smith's explanations out of hand. So, that's the first point. And the second point was that, not only did the agency do that, but it ignored compelling evidence that cut against their position. You know, with respect to the first issue, it seems to me that reasonable minds could differ as to how to interpret any kind of piece of evidence. That wouldn't seem to me to be bad faith, but a wholesale rejection of information that might lead to a different conclusion, that's a more difficult question. So, maybe you can address why, on this record, those two things don't amount to bad faith. So, I start by saying, just by realigning the record, it's the first document ever at issue was the NIE. That's not challenged here. The second document is Senator Smith's critical assessment. I would note that that's been redacted. The same bases, B1, B3. My friends have not challenged that. So, it's significant that the CIA is a good faith actor in redacting that document, the critiquing document. But then somehow, when we issue joint report number three, whose purpose was not identical to document one, which is meant to serve as the final rebuttal instrument in this long dialogue, that becomes an act of good faith. And I think I am questioning your Honor's premise of the question, because Senator Smith has not reviewed the redactions to the joint report, or made any critiques to the joint report, the document that's at issue here. So, we have not even found evidence in buckets to draw out of to even launch at the CIA, because ultimately, it was a different document that's at issue. It is not the same as the NIE. It's coming to different conclusions. Its purposes are different. And these are things that we've outlined in our papers. But I think because of these differences, that it is just a spirited disagreement. But ultimately, the brass tacks here, in my very remaining time, is whether or not information was withheld properly under exemptions one and three. We withheld information in the critical assessment. The key instrument that my colleague is using is that the government is engaging in bad faith. That's not being challenged. And so, we'd ask the court to affirm unless there's further questions. All right, thank you very much. Mr. Clark. Thank you, Your Honor. First off, no court has ever rejected the plaintiff's version, the plaintiff's view of bad faith in the underlying activities. None, it hasn't. I feel like the D.C. Circuit did. It said that would be too attenuated. We're really just looking at the affidavit and the conduct of the FOIA litigation. And going back beyond that would be too attenuated, no? No, I don't think so. If this court were to adopt that view, that would mean other misconduct, like MK-Ultra, extraordinary rendition, Iran-Contra, drug trafficking, search of Senate investigators' computers, human rights violations, would all be out the door. Now, the Reporters Committee, in the Reporters Committee case, the Supreme Court said that the overall goal of the Freedom of Information Act is to open the inner workings of government to public scrutiny. And I suggest that the district court's view undermines that purpose. And as a senator, or Congressman Billy Hendon wrote a book about these men that we left behind at the close of the Vietnam War, and he entitled his book, An Enormous Crime. And that's exactly what this is. The intelligence community has been lying to Congress, the American people, the families. It's an enormous crime, and I suggest to the court that that is the reason that the United States that they are withholding this information regarding what the Russians had said about the Vietnamese conduct in withholding POWs at the close of the Vietnam War. And again, I understand that there's an issue or a problem, can be a problem, for the government to reveal too much in their affidavit. But I still cannot imagine how it is that this information that is withheld would undermine national security. Now, the government says, well, some of these people could even be alive and that would be something that we should keep, if they were confidential sources, that's something we should keep, that they should withhold. Well, the government hasn't said that any of these people have not passed away. I would think that would be a condition preceding to making that argument. Plus, we've been at war with Russia for almost four years now. Again, I just don't see how it is that the information that we're seeking, which is what the Russians had to say about the unrepatriated Americans at the close of the Vietnam War, implicates any national security issue. Thank you. Thank you, Mr. Clark. All right, we'll come down in Greek Council, take a five-minute recess, then come back and speak with our visitors from the North Carolina Bar Association.
judges: Albert Diaz, Pamela A. Harris, DeAndrea Gist Benjamin